LYON and others *v.* COUNCIL BLUFFS SAV. BANK and others.

*(Circuit Court, S. D. Iowa, W. D.* September Term, 1886.)

FRAUDULENT CONVEYANCES — CHATTEL MORTGAGE — STOCK IN TRADE — MORTGAGOR IN POSSESSION.

In August, 1884, P., a merchant, mortgaged to defendant bank, to secure the payment of three notes due in September, October, and November for $3,500, his goods then in stock, and that might thereafter be added thereto, together with the furniture and fixtures, and all notes, book-accounts, and evidences of indebtedness owned by P. The mortgage, by its terms, permitted P. to sell the property in the usual course of trade. It was delivered to the bank at the time of its execution, but not recorded till March, 1885, seven months after. The notes were not paid when due. In September, 1884, P. purchased of plaintiff, on credit, goods of the value of $3,704.56, which were added to the mortgaged stock. Plaintiff, at the time of the sale, was ignorant of the mortgage, and made the sale in the belief that the stock was unincumbered. The bank had a $5,000 mortgage on P.'s homestead, which was exempt from execution. It applied $2,000 deposited with it by P., proceeds of the sale of this stock of goods, in part payment of this mortgage. Plaintiff recovered judgment against P. for his claim, attached the goods, and sued to set aside the mortgage. *Held,* that the chattel mortgage was void as against plaintiff, because it, and the transactions under it, operated as a fraud on him.

In Equity. Bill to set aside chattel mortgage.
*Mills & Keeler* and *Wright, Baldwin & Haldane,* for complainants.
*D. C. Bloomer,* for defendant.

SHIRAS, J. In the year 1884 one James Porterfield was engaged in business at Council Bluffs, Iowa, as a retail dealer in dry goods, and on the thirtieth of August of that year he borrowed of the Council Bluffs Savings Bank the sum of $3,500, for which he executed his three promissory notes, maturing September 29, October 29, and November 28, 1884, and to secure the payment thereof he also executed a chattel mortgage dated August 30, 1884, and covering "all my certain stock of dry goods, notions, hosiery, cloaks, and all other goods that are now in stock, or may hereafter be added thereto, owned and kept by me in a certain store, * * * together with all furniture and fixtures thereunto belonging; also all notes, book-accounts, and other evidences of indebtedness now owned by me." The mortgage, by its terms, permitted the mortgagor to sell the property in the ordinary course of trade. This

mortgage was delivered to the bank at the time of its execution, but it was not recorded until March 20, 1885, nearly seven months after its execution.

In September, 1884, Porterfield went to New York, and bought, on credit, of complainants, goods of the value of $3,704.56, which were placed in the store containing the stock covered by the mortgage. When these sales on credit were made by the complainants, they had no knowledge of the existence of the unrecorded mortgage, and sold the goods in the belief that Porterfield's stock was unincumbered. On March 20, 1885, as already stated, the mortgage was placed upon record, and on the next day the bank took possession of the property described in the mortgage, for the purpose of foreclosing the same. On the twenty-fifth of March, 1885, Porterfield made a general assignment for the benefit of creditors to C. R. Scott, and complainants brought an action at law against Porterfield, aided by attachments, to the August term, 1885, of the circuit court of Pottawatamie county, and recovered judgments for the amounts due them from Porterfield. Complainants also filed a petition in equity in the state court for the purpose of contesting the validity of the mortgage to the savings bank, and asked the issuance of a writ of injunction under the provisions of section 3317 of the Code of Iowa. The writ was issued and served upon the bank, and then, upon application of complainants, who are, and were when the suit was commenced, citizens of the state of New York, the cause was removed into this court, and is now submitted upon the evidence introduced by both parties; the question being whether the chattel mortgage is valid as against the claims and equities of complainants.

Counsel for the mortgagee cites authorities in support of the well-recognized proposition, that the construction put upon the language of a state statute by the supreme court of the state is binding alike upon the federal and state courts, and then claims that the supreme court of Iowa, in a series of decisions beginning with *Hughes* v. *Cory*, 20 Iowa, 399, and ending with *Meyer* v. *Evans*, 66 Iowa, 179, S. C. 23 N. W. Rep. 386, has held "that the fact that the mortgagor retains possession of the mortgaged property, and reserves the right to sell the same in the ordinary course of trade, and apply the proceeds to his own use, does not render the mortgage fraudulent in law;" and that consequently the United States courts are bound to hold, in all such cases, that the mortgage is valid as against all parties.

It would seem that a mischievous misunderstanding has arisen in the minds of many in the community, not only touching the rulings in this court upon the validity of chattel mortgages, but also in regard to the true meaning and scope of the decisions of the supreme court of Iowa upon this subject. The impression seems to prevail that the rulings of the federal and state courts upon the true construction of the Iowa statute are radically different; yet a careful examination of the rulings actually made will show that this impression is an error.

The fatal mistake made by many is in assuming, as is practically done by counsel for defendant in this case, that when the supreme court of

Iowa decided, in *Hughes* v. *Cory*, and other cases based thereon, that, under the facts appearing in the several cases, the chattel mortgages under consideration could not be declared *to be invalid as a matter of law*, that the court meant to declare, and did declare, that the mortgages were *valid as a matter of law*. The rule actually laid down is that the court could not, under the facts presented in the several cases, declare, as a matter of law, that the mortgages were either valid or invalid, but that the question of invalidity was one of fact to be decided in each case upon the evidence and the conclusions to be deduced therefrom. To ascertain just what has been in fact held by the supreme court of Iowa, a brief examination of the leading cases may not be out of place.

Under the rules of the common law, and under the provisions of the statute of 13 Eliz., as construed in *Twyne's Case*, 3 Coke, 80, if the vendor or mortgagor of chattels was allowed to continue in possession, and use the property as his own, the transfer would be deemed fraudulent as a matter of law.

The Code of Iowa, § 1923, provides that "no sale or mortgage of personal property, where the vendor or mortgagor retains actual possession thereof, is valid against existing creditors, or subsequent purchasers without notice, unless a written instrument conveying the same is executed, acknowledged like conveyances of real estate, and filed for record with the recorder of the county where the holder of the property resides."

By this statute the recording of the mortgage gives the notice of change in ownership which was secured at the common law by requiring an actual and visible change of possession, and therefore the mortgagor might retain possession of the property, the mortgage being recorded, without giving rise to a presumption of fraud as a matter of law. *Torbert* v. *Hayden*, 11 Iowa, 435; *Wilhelmi* v. *Leonard*, 13 Iowa, 330; *Jordan* v. *Lendrum*, 55 Iowa, 478; S. C. 8 N. W, Rep. 311. By reason of the fact that the statute declares the mortgage, if not recorded, to be invalid only against creditors and purchasers, it is held that an unrecorded mortgage will not, as between the mortgagor and mortgagee, be rendered invalid simply because it is not recorded, and also that an unrecorded mortgage is valid as against all creditors and purchasers who have actual notice of its existence when their rights accrue, (*McGavran* v. *Haupt*, 9 Iowa, 83; *Allen* v. *McCulla*, 25 Iowa, 464;) also that, if withheld from the record for a time, and then recorded, the mortgage will become a lien, as against creditors and purchasers without actual notice of its existence, from the date when it is filed for record.

These decisions of the supreme court of Iowa are constructions of the language and true meaning of the Iowa statute, and the federal courts are bound to follow these interpretations of its meaning in all cases wherein the rights of parties are dependent upon the meaning of the statute. No case can be found in the reports, decided in the federal courts for Iowa, in which a construction of the Iowa statute has been adopted which differs from that announced by the supreme court of the state. It is possible that cases may be found which do not differ greatly in their facts, and in which different conclusions have been reached in the state and

federal courts; but it will appear that these differing decisions are not based upon diverse constructions of the Iowa statute, but upon diverse conclusions of fact drawn from the evidence in the cases.

. As between a creditor and a mortgagee the question of the rights arising under the mortgage may be (1) a question of priorities of lien, in cases in which fraud is not an element, and where the question of priority usually depends upon the meaning of the statute of the state; (2) a question of fraud, in which the inquiry is whether the mortgage is in fact fraudulent, as against creditors, by reason of the fact that it is used as a cover and shield for the protection and benefit of the mortgagor, to the injury and delay of creditors, or that its existence is kept a secret, with the intent to thereby mislead third parties, to their loss and injury.

The question of whether a mortgage is fraudulent in fact is not determinable usually by the construction of the Iowa statute providing for the recording of mortgages, and the retention of possession by the mortgagor, but is a question of fact, to be determined in each case upon the evidence submitted and pertinent to the issue. Let us now see what are the views of the supreme court of Iowa upon what facts may be considered as tending to show fraud.

In the case of *Torbert* v. *Hayden*, 11 Iowa, 435, the trial court had ruled, in instructing the jury, that a mortgage of personal property, which gives to the mortgagor the possession and right to sell the property, was fraudulent in law, irrespective of the intent of the parties. The supreme court reversed this ruling, holding that the statute authorized the mortgagor to remain in possession, and that whether the power of disposition by the mortgagor rendered it void was a question of fact. Thus it is said:

"On the other hand, it is easy for us to conceive how such a mortgage may be fraudulent in *fact*, whether the possession of the property be in one party or the other, and notwithstanding it may be regularly executed, duly recorded, and all fair upon its face; yet such fact or fraudulent intent must be shown by extrinsic evidence, and be pronounced by the jury. But in so doing the jury could infer nothing from the possession of the property by the mortgagor, for this would be entirely consistent with the authority of the statute if the parties had duly complied with the terms thereof. The manner, however, of possession, would be a proper subject of inquiry. If it was accompanied with the power of disposition, or used in any way inconsistent with the object of the security of the rights of the mortgagee, there would be badges of fraud, not absolute, but *prima facie*, requiring explanation. * * * Whether, therefore, possession, with the right to deal with the property as his own, is fraudulent in a mortgagor, is a question of intent, and will depend entirely upon the circumstances explaining such acts of ownership. If a stock of goods is mortgaged to their whole value, and the mortgagor is permitted to hold possession, sell, and pocket the proceeds, such acts would be wholly irreconcilable with the object of the mortgage and the interest of the mortgagee; and the inference that the mortgagor had a secret or beneficial interest reserved would perhaps be irresistible. These illustrations show, as we think, the soundness of the rule that whether a chattel mortgage under our statute, when the mortgagor retains possession, and deals with the property as his own, is fraudulent or not, is a question of fact for the jury, and not one of law for the court."

In *Hughes* v. *Cory*, 20 Iowa, 399, is found a full discussion of the meaning of the Iowa statute, with a review of all the previous decisions, and the conclusion is reached that "the mere retention of possession, where the instrument is recorded, is, therefore, no longer either *per se* fraudulent, or a badge of fraud *in law*. It may be a circumstance, with others, to prove fraud in fact." After a citation of authorities, the opinion proceeds:

"We admit that, if the instrument is fraudulent in fact, it is invalid; but this was not pretended. A mortgage may be fraudulent in fact because there is no real debt, or, if one, because it is knowingly and purposely overstated, to deceive and keep off other creditors. When these facts are proved, fraud is an inference of law, and the jury is, under the direction of the court, bound to find it. Or, though there be a real debt, yet, if it can be shown that the controlling motive and object in making and taking the mortgage was not to secure the debt, but to hold the instrument as a shield to protect the debtor from his other creditors, this would make the mortgage fraudulent. The court should so instruct, and the jury should so find. These are merely instances of actual fraud, and other cases may be easily imagined. Any instrument is fraudulent which is a mere trick or sham contrivance, or which originates in bad motives or intentions, that is made and received for the purpose of warding off other creditors. * * * But, if the debt be real, and the creditor, in good faith, desires security, what objection is there, in reason, to just such a transaction as that which is disclosed in the mortgage now before us? * * * Why, we ask, should he not be permitted to stipulate for time, and for the right to dispose of his goods, and apply the proceeds to the payment of his debts?

"No reason can be given, unless the arrangement be such, from its intrinsic nature or inevitable tendency, as unnecessarily and injuriously to affect or impair the rights of other creditors. 'A creditor ought not,' says GIBSON, J., in *Clow* v. *Woods*, 5 Serg. & R. 275–280, 'to be suffered to secure himself by means which will ultimately work an injury to third persons.' This is right. Nor ought a debtor in failing circumstances be permitted, by deed, mortgage, or assignment, so to dispose of his property as to reserve a portion for himself, or to postpone his creditors. * * * The most that could be claimed by the defendants would be that the special provision enabling the mortgagor to sell the goods would be evidence of fraud in fact, the value and strength of which would depend upon the other circumstances of the case. If the value of the goods largely exceeded the amount of the debt, permission to sell for a limited time, in the usual retail way, especially if the stipulated proceeds were strictly applied towards the reduction of the debt, would of itself be no very satisfactory evidence that the mortgage was fraudulent; that is, that it was taken to delay and keep off other creditors, and for the benefit of the mortgagor. But if the debt exceeded the value of the goods, if the sales were made and the proceeds not applied, and the property was depreciating, or being gradually dissipated, or appropriated to the mortgagor's use, this would be quite satisfactory evidence, certainly, unless rebutted and explained, that the mortgage was intended, not as a security to the mortgagee, but as a shield to the mortgagor, and therefore fraudulent."

In this case of *Hughes* v. *Cory* the mortgage provided that the mortgagor might sell the goods in the usual way of trade; being bound, however, to make additions thereto, so that the amount of the stock should not be substantially diminished, and being further bound to apply 33⅓ per cent. of the sales to the payment of the mortgage debt. Of course,

if the provisions of the mortgage were carried out, the result would be that the mortgage debt would be paid, and the mortgagor would have then on hand a stock equal in value to that possessed by him when the mortgage was given. The trial court held the mortgage to be fraudulent upon its face, and excluded it from the evidence submitted. The supreme court reversed this ruling, and laid down the principle to be applied in such cases as follows:

"What the court decides in the present cause is that the mortgage was not conclusively fraudulent on its face, or fraudulent *per se, as a matter of law;* and that whether fraudulent in *fact* or not should have been decided upon all the evidence, including, of course, the terms of the instrument itself."

In *Clark* v. *Hyman,* 55 Iowa, 14, S. C. 7 N. W. Rep. 386, the court reaffirmed the rule announced in *Hughes* v. *Cory,* that the reservation of the right to sell the mortgaged goods in the usual course of trade did not, as a *matter of law,* render the mortgage fraudulent, even though the mortgage did not require the mortgagor to account for and pay to the mortgagee any part of the proceeds of the goods, and that the mortgage was valid, unless it was fraudulent in fact, and that a careful examination of the whole evidence failed to show that the mortgagee took the mortgage for the purpose of delaying or defrauding creditors.

In *Sperry* v. *Etheridge,* 63 Iowa, 543, S. C. 19 N. W. Rep. 657, it is stated that—

"There was evidence tending to prove that, when the mortgages were given, there was a parol agreement between plaintiffs and Hamilton to the effect that Hamilton should remain in possession of the property, and should continue to carry on the business of the store, selling the goods in the usual course of trade, and applying the proceeds to the payment of his debts, and to the purchase of other goods to replenish his stock, and to the payment of the running expenses of the store, and for the support of himself and family. The evidence also tends to prove that Hamilton was insolvent at the time the mortgages were given. * * * The ruling of the circuit court was, in effect—*First,* that the facts which the evidence tended to prove, if proved, would not render the mortgages fraudulent in law; and, *second,* that said facts would not have any tendency to prove that the mortgages were given and received with any actual intent to defraud the other creditors of Hamilton."

As to the first point, the supreme court held that the doctrine of *Hughes* v. *Cory* sustained the circuit court in holding that the mortgages would not be declared fraudulent as a matter of law; but upon the second point the supreme court ruled —

"That the circuit court erred in refusing to submit to the jury the question whether the mortgages were fraudulent in fact. It cannot be said that there was no evidence tending to prove that they were executed with intent to defraud or delay the other creditors of Hamilton. It is said in *Torbert* v. *Hayden,* 11 Iowa, 435: ' Whether a chattel mortgage, when the mortgagor holds possession, and deals with the mortgaged property as his own, is fraudulent or not, is a question of fact for the jury, and not one of law for the court.' And in *Hughes* v. *Cory* it is said that, while the mere retention by the mortgagor of the property, where the instrument is recorded, is no longer either *per se* fraudulent or a badge of fraud, it may be a circumstance, with others, to prove fraud in fact. The evidence given on the trial tended to establish a number of circumstances, in addition to the fact that the mortgagor retained

possession; such as the insolvency of the mortgagor, and the parol agreement that he might sell the property, and appropriate a portion of the proceeds to his individual use, which the defendant had the right to have considered in determining the question whether the mortgage was given with an actual fraudulent intent."

In *Jaffray* v. *Greenbaum*, 64 Iowa, 492, S. C. 20 N. W. Rep. 775, on behalf of the attaching creditors, it was contended that the court should declare the mortgage fraudulent *in law*, because it was provided in the mortgage that the mortgagors should retain possession of the goods, with the right to carry on business for one year; being bound, however, to pay the expenses of carrying on the business, and to keep up the value of the mortgaged property by making additions thereto. It was held that, under *Hughes* v. *Cory*, the mortgage could not be declared fraudulent as a matter of law; it being stated, however, that "a mortgage upon a stock of goods which should provide for sales that would exhaust the stock, without any provision for an application of the proceeds on the mortgage debt, might well be declared fraudulent. Such a mortgage could hardly be deemed to have been taken as security; and, if it was not taken as security, the inference would be that it was solely for the debtor's protection by hindering other creditors."

In *Meyer* v. *Evans*, 66 Iowa, 179, S. C. 23 N. W. Rep. 386, the rule laid down in *Hughes* v. *Cory* is again affirmed and followed.

We have thus cited the leading cases to be found in the Iowa Reports upon the question of chattel mortgages, and without exception they refer to *Hughes* v. *Cory* as the case which fully and authoritatively construes the statute of Iowa regarding chattel mortgages, and the changes worked thereby in the rule of the common law. Upon that case, then, we are justified in relying, when called upon to ascertain the view taken by the supreme court of Iowa of the provisions of the Iowa statute, and the validity of chattel mortgages thereunder.

What, then, are the general rules to be deduced from the opinion in *Hughes* v. *Cory*, as illustrated and explained by the later decisions based thereon? They are: (1) That, under the statute of Iowa, the recording of a chattel mortgage takes the place of the change of possession required by the rule of the common law. (2) That the fact that the mortgagor of chattels remains in possession of the property, with the right to use the same, or even, in the case of a stock of goods, with the right to sell the same in the usual course of trade, will not justify a court in holding the mortgage to be fraudulent as a matter of law. (3) That, in such cases, the question of invalidity on ground of fraud is a question of fact, to be determined, in each case, upon all the facts and circumstances of the particular transaction, including the provisions of the written instrument or mortgage. (4) That the mere fact that the mortgagor, by the reservations in the mortgage, contracts for and exercises the right to sell the mortgaged goods in the usual course of trade, does not necessarily show that the mortgage is fraudulent in fact. Regard must be had to the object and purpose of this right thus reserved, and the actual use made thereof. If, by reason of such sales, the mortgaged stock is being de-

preciated materially in value, and the proceeds of the sales, instead of being used in payment of the mortgage debt, are used for the special benefit and advantage of the mortgagor, such fact justifies the finding that the mortgage is intended and used as a means of warding off other creditors, and securing the enjoyment of the property to the mortgagor, in which case the mortgage would be fraudulent in fact. (5) That, where the facts proven show either that there is no real debt due from the mortgagor to the mortgagee, or that the amount is knowingly overstated for the purpose of deceiving creditors, or that, though there be a real debt of the amount stated in the mortgage, the controlling motive and object in making and taking the mortgage is not solely security for the debt, but to hold the instrument as a shield for the protection of the debtor against other creditors, or as a means of warding off other creditors, or wrongfully hindering and delaying them, for the benefit of the debtor, then, the facts being proven, fraud is an inference of law, and the court is bound to instruct the jury that, the facts being proven, fraud is the necessary legal inference; or, to quote the exact words used in *Hughes* v. *Cory:* "When the facts are proved, fraud is an inference of law, and the jury is, under the direction of the court, bound to find it."

Let us now examine the rulings made by the federal courts, and see what principles are recognized or announced therein on this subject.

The leading case decided by the supreme court is that of *Robinson* v. *Elliott*, 22 Wall. 513. The court, after considering the special provisions of the Indiana statute, and the construction thereof by the supreme court of that state, proceeds to say:

"There is, therefore, nothing in the way of the consideration of the main question involved in this controversy on its merits. If chattel mortgages were formerly, in most of the states, treated as invalid, unless actual possession was surrendered to the mortgagee, it is not so now, for modern legislation has, as a general thing, (the cases to the contrary being exceptional,) conceded the right to the mortgagor to retain possession, if the transaction is on good consideration and *bona fide*. This concession is in obedience to the wants of trade, which deem it beneficial to the community that the owners of the personal property should be able to make *bona fide* mortgages of it, to secure creditors, without any actual change of possession. But the creditor must take care, in making his contract, that it does not contain provisions of no advantage to him, but which benefit the debtor, and were designed to do so, and are injurious to other creditors. The law will not sanction a proceeding of this kind. If he goes beyond this, and puts into the contract stipulations which have the effect to shield the property of his debtor, a court of equity will not lend its aid to enforce the contract. These principles are not disputed, but the courts of the country are not agreed in their application to mortgages with somewhat analogous provisions to the one under consideration. The cases cannot be reconciled by any process of reasoning, or any principle of law.

"As the question has never before been presented to this court, we are at liberty to adopt that rule on the subject which seems to us the safest and wisest. It is not difficult to see that the mere retention and use of personal property until default is altogether a different thing from the retention of possession, *accompanied with the power to dispose of it for the benefit of the mortgagor alone.* The former is permitted by the laws of Indiana, is con-

sistent with the idea of security, and may be for the accommodation of the mortgagee; but the latter is inconsistent with the nature and character of a mortgage, is no protection to the mortgagee, and of itself furnishes a pretty effectual shield to a dishonest debtor. We are not prepared to say that a mortgage, under the Indiana statute, would not be sustained which allows a stock of goods to be retained by the mortgagor, and sold by him at retail for the express purpose of applying the proceeds to the payment of the mortgage debt. Indeed, it would seem that such an arrangement, if honestly carried out, would be for the mutual advantage of the mortgagee and unpreferred creditors. But there are features engrafted on this mortgage which are not only to the prejudice of creditors, but which show that other considerations than the security of the mortgagees, or their accommodation, entered into the contract. Both the possession and right of disposition remain with the mortgagors. They are to deal with the property as their own, sell it at retail, and use the money thus obtained to replenish their stock. There is no covenant to account with the mortgagees, nor any recognition that the property is sold for their benefit. Instead of the mortgage being directed solely to the *bona fide* security of the debts then existing, and their payment at maturity, it is based on the idea that they may be indefinitely prolonged."

The court then proceeds to discuss the facts, and, viewing the instrument in the light thrown thereon by the acts of the parties, the conclusion is reached that, "whatever may have been the motive which actuated the parties to this instrument, it is manifest that the necessary result of what they did do was to allow the mortgagors, under cover of the mortgage, to sell the goods as their own, and appropriate the proceeds to their own purposes; and this, too, for an indefinite length of time." And, as the court found that the mortgage on its face showed that this was the object and intent of the parties, the law would impute to it a fraudulent purpose, and therefore declare it void; which conclusion, in effect, is the same as that announced in *Hughes* v. *Cory*, to-wit, that, "when these facts are proven, fraud is an inference of law, and the jury is, under the direction of the court, bound to find it."

Turning now to the decisions made in this circuit, we find that in *Cragin* v. *Carmichael*, 2 Dill. 519, it was ruled that in the state of Iowa, under the construction of the statute of the state as made by the state supreme court, "an unrecorded mortgage of chattels, where the mortgagor retains possession, is valid against attaching creditors with notice of its existence at any time before levy."

In *Crooks* v. *Stuart*, 2 McCrary, 15, S. C. 7 Fed. Rep. 800, it appeared that the mortgages were not recorded for about a year after their execution, and that the mortgagors, with the consent of the mortgagees, continued in possession of the stock of goods, selling the same in the usual course of trade, and using the proceeds for their own purposes. The circuit judge held that, under the construction of the statute by the state supreme court, the fact that the mortgages were not recorded would not defeat the same, in favor of creditors who had notice of the existence of the mortgages at any time before they obtained a lien thereon by levy or otherwise, and that this construction of the statute was binding upon the federal court, but that the question whether the mortgages should be held void independently of the statute, upon the ground that the mort-

gagor had, with the assent of the mortgagee, remained in possession for over a year, selling the property as his own, and using the proceeds for his own purposes, was a question of general jurisprudence, not depending upon the state law, and to which the decision of the supreme court in *Robinson* v. *Elliott* was applicable; and that, under the doctrine of that case, it must be held that the mortgage was void.

In *Argall* v. *Seymour*, 4 McCrary, 55, it appeared that the mortgage did not by its terms permit the mortgagor to remain in possession and sell the goods, but the evidence showed that the mortgagor did, with the assent of the mortgagee, remain in possession for about 60 days, and dealt with the property as his own; but there was no other evidence of actual or intentional fraud, or of an intent to cover up the property, and protect it from other creditors, and the court held that there was not evidence enough to show fraud in the mortgage, and therefore it was held valid as against all creditors except such as might have been misled into dealing with the mortgagor during the time the mortgage had been withheld from the record, leaving the property in possession of the mortgagee. The opinion in the case clearly recognizes the doctrine of *Robinson* v. *Elliott* to be that if the facts of the case, whether these are shown by the recitals in the mortgage or by proof of the acts of the parties, or by both, show that the mortgage, instead of being intended as a *bona fide* security for the debt, is used as a means of hindering and delaying other creditors, then it is fraudulent in fact, and that the law will so declare it. This case also enunciates and enforces the doctrine that if the mortgagee withholds the mortgage from the record, permits the mortgagor to remain in possession and deal with the property as his own, and thus enables the mortgagor to buy goods on credit upon the faith of being the owner of an unincumbered stock of goods, the rights of the innocent vendor may be superior to those of the mortgagee.

In *Simon* v. *Openheimer*, 20 Fed. Rep. 553, it appeared that the mortgage was withheld from record for some eight months, the mortgagors remaining in possession, selling the goods as their own, and using the proceeds for their own benefit, and buying on credit goods to a large amount; the parties selling the same having no knowledge of the existence of the unrecorded mortgage, which goods were placed in the stock covered by the mortgage, and were subsequently taken possession of by the mortgagee; and, in view of these facts, it was held—

"That the mortgagee is estopped from asserting that he has, under his mortgage, a valid lien superior and prior to the rights of the creditors. Knowing that the mortgagor was dealing with the stock as his own, and that third parties would be justified in believing that the stock belonged to Openheimer free from any lien, the mortgagee stands by, and permits him to hold himself out to the world as the owner of the stock free from liens, and to buy on credit a very large quantity of goods, which were added to the stock, and thereby made subject to the lien of the mortgage, as between the mortgagor and mortgagee. Having chosen to keep the knowledge of the existence of his mortgages from the public, when he should, in good conscience, have given publicity thereto, and having thereby misled the creditors into making large sales of goods on credit to the mortgagor, he should not now, when it

is to his advantage, and to their injury, be allowed to assert that he holds a valid prior lien upon the stock of the common debtor, the larger part of which consists of the very goods sold by the creditors in ignorance of the existence of the mortgage."

In *Rumsey* v. *Town*, 20 Fed. Rep. 558, the same rule is recognized.

The case of *Wells* v. *Langbein*, Id. 183, is cited as an authority for the doctrine that the mere fact that the mortgage upon its face provided that the mortgagor should remain in possession, with the right to sell in the usual course of trade, renders the mortgage absolutely void, without reference to the question of the manner and purpose of the sale. Taking certain sentences, found in the opinion, by themselves, as intended to lay down an abstract proposition, and this construction would find support; but that is not the true construction of the opinion. The main question discussed in that case was as to the effect to be given to the fact that the mortgagee had taken possession of the goods before a levy was made thereon. Upon the other proposition, the statement is that the mortgagees came within the rule announced in *Robinson* v. *Elliott* and *Crooks* v. *Stuart*, and it was not intended to extend in any manner the rule as recognized and announced in these cases.

The view actually entertained is more fully set forth in the subsequent case of *Maish* v. *Bird*, 22 Fed. Rep. 576, in which it was strongly contended by counsel, upon petition for rehearing, that the mortgage, by its terms, showed that it was the intent of the parties that the mortgagor should remain in possession, and sell the goods in the usual way of trade, and that, therefore, it must be declared void as a matter of law; but it was held that "it is clear, therefore, that the mere fact that the mortgagor remains in possession, and sells the goods at retail, does not *ipso facto* determine the question of the validity or invalidity of the mortgage. The query is, does he sell them for his own benefit, or for the benefit of the mortgagee? Now, this question may be answered from the stipulation expressly stated in the mortgage, or from information derived from the acts of the parties. If from either or both sources it appears that the sales are made by the mortgagor, with the consent of the mortgagee, for the benefit of the former, then the case is brought within the rule announced in *Robinson* v. *Elliott*." The mortgage was sustained on the ground that the evidence failed to show that it was used or intended as a cover and protection to the mortgagor.

These cases are all that are reported in the Iowa districts, and fairly represent the views held by the federal courts in Iowa upon the questions therein involved. It will be noticed that these cases present two different questions:

*First.* The rule to be followed where the mortgagee has intentionally withheld the mortgage from record, permitting the mortgagor to remain in possession, and to deal with the stock covered by the mortgage as his own, and thereby aiding the mortgagor to buy goods on credit, which otherwise he could not have done, which goods, when so bought on credit, and added to the stock, pass, by the terms of the mortgage, to the mortgagee. The cases cited hold that the fact that the mortgage was

not recorded is a matter open to explanation; but, if it appears that the mortgagee intentionally withheld the instrument from record, keeping the existence thereof secret, and permitted the mortgagor to remain in possession of and deal with the stock of goods as his own, and to buy additions to the stock on credit, thereby aiding the mortgagor in making purchases of goods on a false credit, the goods, when thus purchased, being added to the stock covered by the mortgage, the mortgagee will be estopped, as against parties thus misled, from asserting the existence of a lien under his mortgage.

In the leading case of *Pickard* v. *Sears*, 6 Adol. & E. 469, it was stated that "the rule of law is clear that where one, by his words or conduct, willfully causes another to believe the existence of a certain state of things, and induces him to act on that belief so as to alter his own previous position, the former is concluded from averring against the latter a different state of things as existing at the same time;" or, as stated in the subsequent case of *Gregg* v. *Wells*, 10 Adol. & E. 90: "A party who negligently or culpably stands by, and allows another to contract on the faith and understanding of a fact which he can contradict, cannot afterwards dispute that fact in an action against the person whom he has himself assisted in deceiving."

In *Morgan* v. *Railroad Co.*, 96 U. S. 716, in discussing the effect of an estoppel *in pais*, it is said:

"The principle is an important one in the administration of the law. It not unfrequently gives triumph to right and justice when nothing else could save them from defeat. It proceeds upon the ground that he who has been silent as to his alleged rights when he ought in good faith to have spoken, shall not be heard to speak when he ought to be silent. He is not permitted to deny a state of things which, by his culpable silence or misrepresentations, he had led another to believe existed, and who has acted accordingly upon that belief. The doctrine always presupposes error on one side, and fault or fraud upon the other, and some defect of which it would be inequitable for the party against whom the doctrine is asserted to take advantage."

In the cases in which an estoppel has been applied to defeat the mortgage lien, it appears that there was error on part of the creditors, who were induced to sell their goods on credit to one whom they supposed was in fact the owner of an unincumbered stock of goods, and whom they were justified in believing was in truth the full owner of the goods, with the undoubted right to sell the same and apply the proceeds to the payment of the debts created in replenishing the stock, whereas, in fact, if the mortgage be held valid, he was not such owner, and the goods, so soon as added to the stock, became bound for the mortgage debt, and this error arose from the fault of the mortgagee, in that, while he permitted the mortgagor to remain in possession and deal with the stock as his own, he also intentionally withheld the mortgage from record, thereby enabling and aiding the mortgagor, by means of a false credit, to buy goods on credit, and thus subject to the lien of his mortgage property procured from the owner by means of a misrepresentation to which he has given aid and countenance by withholding the mort-

v.29F.no.12—37

gage from record. No decision upon this exact question by the supreme court of Iowa has been called to my attention, but that court has always fully recognized and enforced the doctrine of estoppel in cases demanding its application, and will doubtless do so, in cases involving chattel mortgages, when the facts are such as to require and justify the application of the principle.

The second question presented and decided in the cases arising in the federal courts is the rule to be applied when it appears that the mortgagor has, with the assent of the mortgagee, been left in possession of the stock covered by the mortgage, with the right to sell the goods, and use the proceeds for his own benefit, and not for the purpose of paying the mortgage debt. The doctrine of the cases is that where it appears from the provisions and stipulations of the mortgage, or from the acts of the parties, or from both sources, that it was the intent of the parties that the mortgagor should remain in possession of the stock of goods, and sell the same in the usual course of business, and apply the proceeds to his own uses and benefit, and not to the payment of the mortgage debt, this is evidence showing that the mortgage, instead of being intended as a *bona fide* security for a debt, was intended and used as a means of hindering and delaying other creditors, and as a protection to the debtor, enabling him to carry on his business, and sell the property for his own benefit under the shield of the chattel mortgage; and where, in fact, this has been the use made of the mortgage, the inference of fraud is an inference of law. It will also be borne in mind that parties are presumed to have intended that which is the necessary and natural result of their own deliberate acts; and that, in determining the intent of parties, the evidence of their acts is of more weight than their mere statements or declarations, even though under oath.

We find, then, that the decisions in the federal courts hold that, under the statute of Iowa, the mere failure to record a chattel mortgage does not, as between the mortgagor and mortgagee, render the same invalid; that it has full force, and is valid as to third parties who have actual knowledge of its existence, the same as though recorded; and that, in the absence of fraud or grounds of estoppel, it takes effect when it is finally recorded, and becomes a lien as against all parties who have not acquired rights by purchase, or liens prior to the date of record in ignorance of the existence of the mortgage; that the retaining of possession of the mortgaged property, with the right to sell the same in the usual course of trade, is permissible under the Iowa statute, provided such possession and selling are not used as a means of defrauding other creditors. *Robinson* v. *Elliott*, *Cragin* v. *Carmichael*, *Crooks* v. *Stuart*, *supra*. On these questions, which are mainly dependent upon the construction of the Iowa statute, the federal courts follow the rulings made by the supreme court of Iowa.

As to the rule to be applied when the mortgagee intentionally withholds the mortgage from record, and aids the mortgagor in purchasing goods on credit from parties who do not know of the existence of the secret lien, the doctrine of estoppel is applied, in order to prevent the

perpetration of a fraud upon innocent parties. This is the application of a familiar principle, not dependent upon the Iowa statute.

On the question of invalidity as against creditors, the rulings made in the federal courts find ample support in the doctrines announced in *Hughes* v. *Cory.* That case expressly holds that, granting the right to execute a mortgage upon a stock of goods, with a stipulation that the mortgagor may, for a time, remain in possession and sell the goods, applying the proceeds to the payment of his debts, still "a creditor ought not to be suffered to secure himself by means which will ultimately work an injury to third persons; nor ought a debtor in failing or insolvent circumstances be permitted by deed, mortgage, or assignment so to dispose of his property as to reserve a portion for himself, or to postpone his creditors;" and, further, that in case permission to sell for a limited time is given, "especially if the stipulated proceeds were strictly applied towards the reduction of the debt, this would of itself be no very satisfactory evidence that the mortgage was fraudulent; that is, that it was taken to delay and keep off other creditors, and for the benefit of the mortgagor. But if the debt exceeded the value of the goods; if the sales were made, and the proceeds not applied, and the property was depreciating or being gradually dissipated or appropriated to the mortgagor's use,—this would be quite satisfactory evidence, certainly, unless rebutted and explained, that the mortgage was intended, not as a security to the mortgagee, but as a shield to the mortgagor, and therefore fraudulent."

What is required in the administration of the law in cases of the character under consideration is, on the one hand, to recognize and enforce the right of a creditor to obtain, and the debtor to give, security for the payment of an honest debt, even though the form of the security may be such as to prevent other creditors from levying upon the property of the common debtor until the secured creditor is paid in full, and, on the other hand, to prevent such a use being made of a security given as that it operates as a shield and protection to the debtor, enabling him to use and consume for his own benefit the property covered by the mortgage, and yet leaves the debt supposed to be secured thereby unpaid; for, if this is allowable, it clearly follows that the security, instead of being in fact a security for the benefit of the creditor, turns out to be a security to the debtor against the claims of other creditors, who are consequently unjustly hindered and delayed in obtaining satisfaction of the debts honestly due them.

Where a creditor takes security by way of mortgage upon a stock of goods, leaving the mortgagor in possession with the right to sell in the usual course of trade, the circumstances require of him that he shall not permit his security to be used as a cover and shield to the debtor, to the injury of other creditors. The execution of the mortgage upon the stock of goods practically prevents the other creditors from levying upon the stock until the debt is paid; and, as the mortgagee knows this fact, he should do that which equity and good conscience require under the circumstances. To illustrate the situation. Suppose a mortgage, to se-

cure a *bona fide* debt of $5,000 due in five years, is executed upon the stock in trade of a merchant, and duly recorded; he being left in possession, with the right to sell in the usual course of trade. Third parties obtain judgments against the mortgagor, and can find no property to levy on, save the stock in trade covered by the mortgage. As the mortgagee is not in possession of the goods, a lien cannot be established on the goods by a garnishment of the mortgagee, nor can a personal claim against him be created thereby. *Curtis* v. *Raymond*, 29 Iowa, 52; *First Nat. Bank* v. *Perry*, Id. 266. The interest of the mortgagor in the goods is not such that the same can be levied upon under the execution. *Campbell* v. *Leonard*, 11 Iowa, 489; *Gordon* v. *Hardin*, 33 Iowa, 550. Under the usual form of chattel mortgages in Iowa, if the execution is levied upon the goods, the mortgagee can at once retake the goods; and, when this right is asserted, there is no interest left in the mortgagor which can be made subject to the execution. *Wells* v. *Chapman*, 59 Iowa, 658; S. C. 13 N. W. Rep. 841.

In *Hughes* v. *Cory* it is suggested that, if the mortgagee has the right to possession, the creditors might garnish, and then, under section 3216 of the Revision, have a receiver appointed. The later decisions, just cited, show, however, that no interest in or lien upon the goods can be created by a garnishment, and hence no foundation can be laid for asking the appointment of a receiver. Furthermore, section 3216 of the Revision, now section 2970 of the Code, is confined to cases of attachment, and cannot be made available in aid of an execution.

Again, in *Hughes* v. *Cory*, it is said that, if the creditor admits "the validity of the mortgage, he can levy on the goods,—certainly after a tender." It has been since decided that the mortgagor has no interest left in the mortgaged goods which can be levied upon. How, then, can the execution creditors become clothed with the right to make a tender? Ordinarily, the debtor cannot compel the creditor to accept payment of the debt until the same becomes due. If the creditors have no lien upon the goods, and cannot create any until after a tender, upon what is the right to make the tender and compel its acceptance based? But even if the right to make a tender exists, and by making the same the right to levy upon the stock covered by the mortgage is thereby conferred, still, in many cases, it would be but a barren right. The judgments held by the unsecured creditors may be for amounts due to laborers, or persons of limited means, who would be wholly unable to raise the sum of money needed to make the requisite tender. Indeed, in the great majority of cases, the necessity of tendering, and, if accepted, paying, the amount due upon the mortgage, would practically preclude the creditors from making a levy upon their executions, even if the right so to do was beyond question.

Therefore, in the supposed case of a valid mortgage for $5,000, payable in five years, upon a stock of goods left in possession of the mortgagor, with the right to sell in the usual course of trade, in what way could execution creditors reach the debtor's property included in the mortgage? In fact, does any legal method exist? Are not the credit-

ors, in the supposed case, under the decisions of the supreme court of Iowa, compelled practically to wait until the goods are released from the protecting lien and shield of the mortgage, by the payment of the debt secured thereby? If there exists any shorter path, it has not yet been made plain, and he who makes the venture must do so knowing that many dangers and pitfalls surround the way, even if no absolutely insurmountable barriers are encountered.

I am not arguing that the doctrines found in the several decisions of the supreme court of Iowa construing the rights of creditors under the statute of Iowa are not correct expositions of the law.    Just the contrary. It is *because*, under the statute of Iowa as expounded by the supreme court of the state, creditors are placed at such a disadvantage when a mortgage is executed upon a stock of merchandise, leaving the mortgagor in possession, that it becomes the duty of the mortgagee not to increase this disadvantage by laches on his part.    It seems too often to be assumed by counsel and clients that if, in fact, there is an honest debt due, and a mortgage to secure its payment at a future day can be procured upon the stock in trade of the debtor, that the only duty incumbent upon the mortgagee is to see to it that the stock is not reduced below the amount needed to ultimately pay the mortgage debt, and that, therefore, the mortgagor may permit the debtor to remain in possession, selling the goods in the usual course of trade, and using the proceeds to carry on the business and pay the family expenses of the debtor, or for any other purpose the mortgagee may see fit; and that, as the *motive* of the creditor was simply to get his debt secured, and, that being accomplished, he is willing that the debtor may continue his business for an unlimited time in his own way, and without accountability for the proceeds realized from the mortgaged property, it cannot be said that the *intent* of the parties was to unjustly hinder and delay the other creditors.

This view of the question wholly ignores the rights of the other creditors, and the duty the mortgagee owes to them.    In taking the mortgage upon the stock in trade of the common debtor, and leaving him in possession with the right to sell, the mortgagee knows that the legal effect of his act is to place the stock under the protection of the mortgage, and thereby, so long as the mortgage remains in force, practically to shield the property from being seized in satisfaction of the debts due the unsecured creditors.    He knows that, equitably if not legally, the surplus of the stock over and above so much as may be needed to satisfy his claim belongs to the creditors; that is to say, is justly liable for the debts due them.    He has no right to waste or destroy this surplus, nor is he justified in aiding the debtor in so doing, nor is he justified in permitting the debtor, under the shield of his mortgage, to consume the surplus for his (the debtor's) use and benefit.    If he does do so, then he is aiding the debtor in using the mortgage as a means of keeping the other creditors at bay, while the property is being appropriated, not to the payment of the mortgage debt, but to the uses of the debtor.    In order to prevent just such a result, it is the duty of the mortgagee, in order that the other creditors may not be unjustly debarred from subjecting the property of

the debtor to the payment of their claims, to see to it that the proceeds of the stock are fairly applied to the payment of the debt secured by the mortgage, and are not consumed by the debtor for his own benefit, and thus placed forever beyond the reach of the other creditors, whose claims and equities are as meritorious as his own.

All that is required of a mortgagee, under the doctrines laid down in the decisions of the federal courts, is that, for the protection of third parties from whom the mortgagor may otherwise buy goods on credit, they being ignorant of the existence of the mortgage lien, the mortgagee must place his mortgage on record promptly, which is nothing more than is required of him by the statute of Iowa; and he must not permit the mortgagor, under cover of the mortgage, to sell the property, and, instead of applying the proceeds to the payment of the debt secured by the mortgage, use the same for his own benefit. Certainly, these requirements are not burdensome upon the mortgagee, and experience shows that, unless they are enforced, chattel mortgages become in fact an easy means of hindering and delaying creditors for the benefit of the mortgagor,—a result which proves the wisdom of the rule which holds that it is the duty of the mortgagee to observe the requirements above named.

Properly construed and applied, the principles announced in *Hughes* v. *Cory* sustain every ruling found in the cases subsequently decided by the federal courts, and, instead of there being a want of substantial harmony between the principles enforced by the federal courts and by the supreme court of Iowa upon these questions, it seems to me that, practically, they are in accord. It is this belief, and the hope that a comparison of the decisions would show such substantial agreement, and tend to make clear the rules to be applied in cases of this character, that has led me into preparing so lengthy an opinion in the present cause. Whether I have succeeded, in any degree, in accomplishing the object aimed at, may be doubtful; but I only hope that I have not made "confusion worse confounded."

Coming at last to the facts of this particular case, what do we find? The mortgage was executed August 30, 1884, to secure three notes maturing September 29, October 29, and November 28, 1884. None of these notes were paid at maturity, yet the mortgage was not recorded until in March, 1885. Why? The mortgagor testifies that it was understood and agreed that it should not be recorded, as it would injure his credit. The officers of the bank deny that there was any agreement not to record the mortgage, but give no explanation why it was withheld from record, except that they relied on the mortgagor's promise to pay. When the notes matured, they were not paid, and the bank officers testify that they repeatedly urged and demanded payment of the notes, but unsuccessfully. Under such circumstances, it is not possible that the bank was actuated by any purpose in withholding the mortgage from the record other than that of aiding Porterfield to maintain a false credit, and by means thereof to purchase goods on credit, which, being added to the mortgaged stock, became subject to the lien of the mortgage held by the bank. As against complainants, therefore, who were misled into

selling nearly $4,000 worth of goods on credit, and which now form a large part of the stock upon which the bank claims a prior lien under its mortgage, it must be held that the bank is estopped from asserting any rights under its mortgage.

Furthermore, it appears from the evidence that, after the last note secured by the mortgage came due, to-wit, November 28, 1884, the mortgagee permitted the mortgagor to remain in possession until March 20, 1885, and to sell the goods, using the proceeds for his own purposes. It appears that the bank held a mortgage upon the homestead of Porterfield to secure a debt of $5,000. From the money realized from the sale of the mortgaged goods, the bank received and applied $2,000 in part payment of the real-estate mortgage; thereby relieving the homestead, which is exempt from execution, from so much of the debt resting thereon. This was the exact equivalent of handing the money to Mr. Porterfield to be hidden away by him beyond the reach of legal process. The officers of the bank testify that they felt a sympathy for Mrs. Porterfield, and that Porterfield would not agree to apply the money on the chattel mortgage debt, and that they yielded, and made the application upon the homestead mortgage. This is no excuse. The money was in the bank, and the bank had the undoubted legal right to charge up against it the overdue notes. Again, the money, as the proceeds of the mortgaged stock, was legally applicable to payment of the debt secured on the stock.

The bank, having full legal, as well as actual, control over the money, instead of applying the same to the payment of the mortgage debt, permitted Porterfield to apply it in payment of the debt secured on the homestead; thereby effectually withdrawing the sum thus paid from reach of the other creditors. Not only this, but the moneys realized from the sale of the stock during the seven months Porterfield remained in possession, and which were not deposited in bank, were not used in reducing the debt due the bank, but were otherwise used by Porterfield.

The bank officials and their counsel are unquestionably honest in the belief they express, that no just exception in any particular can be taken to the action of the bank in the premises; and it is for this reason that I have said that a mischievous misconception seems to be entertained by many in regard to the rights and duties of mortgagees towards other creditors. In effect, it is claimed on behalf of the bank that it had a perfect right to leave the mortgagor in full possession of the stock of goods, and yet withhold the mortgage from the record, not only until the debt secured thereby came due, but for months afterwards, and by so doing to aid the mortgagee in keeping up a false credit, and to buy on credit large quantities of goods from parties who had no knowledge of the existence of the mortgage, which goods, when bought, were added to the stock, and thus rendered liable to the secret lien of the mortgage; and, further, that the bank was entirely justifiable, not only in permitting the mortgagor to sell the goods up to the date of the maturity of the mortgage, but for months thereafter, using the proceeds, not in payment of the mortgage debt, but for other purposes beneficial to the mort-

gagor, but also in permitting the mortgagor to use $2,000 of the money in hands of the bank, in payment of a lien upon his homestead; thus practically withdrawing this sum from the reach of other creditors, the payment being made when the bank knew that Porterfield was hopelessly insolvent.

The most liberal construction of the doctrines announced in *Hughes* v. *Cory* would not suffice to sustain the validity of this mortgage under the undisputed facts of the case, and it must therefore be declared void as against complainants.

As the case involves other issues, and the rights of other parties, which are not yet ready for a hearing, the decision now made is confined simply to the question arising between complainants and the savings bank; and is to the effect that, as against complainants, the chattel mortgage held by the bank is invalid and void.